IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 7, 2019

**TOMMY DALE ADAMS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Wilson County**
**No. 09-CR-681    Don R. Ash, Senior Judge**

_____

**No. M2018-00470-CCA-R3-PC**
_____

The Petitioner, Tommy Dale Adams, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury convictions for first-degree felony murder, second-degree murder, and especially aggravated robbery.  On appeal, the Petitioner alleges the following grounds of ineffective assistance of trial counsel: (1) failure to present a cohesive defense theory, investigate, interview the Petitioner and witnesses, and explain the sufficiency of the evidence; (2) failure to object to the trial court's ex parte communication with the jury during deliberations; and (3) failure to advise the Petitioner of his right to testify.  He also alleges ineffective assistance of appellate counsel and  cumulative error stemming from trial counsel's alleged deficiencies.  After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT JR., JJ., joined.

Kara L. Everett, Carthage, Tennessee, for the Appellant, Tommy Dale Adams.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Tommy Thompson, District Attorney General; and Jason L. Lawson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND[1]

_____

[1] Our review of the facts will be limited to those relevant to the issues on appeal.

The October 2009 term of the Wilson County Grand Jury charged the Petitioner with first-degree felony murder, second-degree murder, and especially aggravated robbery. See Tenn. Code Ann. §§ 39-13-202(a)(2), -13-210, -13-403. Following a jury trial, the Petitioner was convicted as charged. See State v. Tommy Dell Adams, No. M2013-01080-CCA-R3-CD, 2014 WL 3565987, at *1-2 (Tenn. Crim. App. Jul. 21, 2014), perm. app. denied (Tenn. Dec. 17, 2014). After the direct appeal, the trial court amended the judgments for counts one and two—felony murder and second-degree murders—to reflect the merger of the two counts, nunc pro tunc to the initial date of sentencing. The Petitioner was sentenced to life for felony murder and a concurrent twenty years for especially aggravated robbery. Id. at *2.

At the trial, Eddie Good testified that on October 3, 2009, Mr. Good hosted a bonfire with the victim, who was visiting Mr. Good for the weekend, and some other friends when the Petitioner, Derrick Blair, Chris Estes, and Chris Cozart arrived uninvited. Adams, 2014 WL 3565987, at *2. Mr. Good had been expecting Mr. Blair to stop by and pick up money Mr. Good owed him, but he did not expect Mr. Blair to be accompanied. Id. The victim had "passed out" inside the house in a chair in the "pool room,"[2] and after some time, Mr. Good asked everyone to leave. Id. Mr. Good acknowledged that he had a "good buzz" from drinking alcohol, smoking marijuana, and consuming a hydrocodone pill. Id. The group of men with Mr. Blair crashed their truck on the way out of Mr. Good's property and borrowed Mr. Good's truck to tow their truck. When that failed, Mr. Cozart and Mr. Estes left in Mr. Good's truck to retrieve a larger truck. Id. The Petitioner and Mr. Blair remained. Id. The men did not return Mr. Good's truck, and although Mr. Good did not recall having argued with them, he remembered "coming to" and sitting by the bonfire with his gun beside him. Id., at *3.

Mr. Good saw a truck come up the driveway, and three people exited and walked toward the house. Adams, 2014 WL 3565987, at *3. One person looked through a window; another looked through the kitchen window from the porch; and a third person looked through the porch door. Id. Mr. Good yelled at the people and fired two rounds in the air. Id. The "smallest of the three" people fired back at him. Id. He opined that the gun fired in his direction sounded like a .22-caliber gun because it "didn't sound that loud." Id. Mr. Good entered the house and fell asleep in his bedroom, and when he awoke, he discovered the victim's body in the pool room. Id. Mr. Good called his mother, who called the police, and Mr. Good waited on the porch for the police to arrive. Id. Mr. Good's truck was found one week later in a creek bed. Id. Mr. Good had "a scuff mark" on his face "where it appeared that someone had hit him with something," but he did not remember being in a fight. Id.

---

[2] The record reflects that this was a room containing a pool table.

-2-

Jody Hayes, one of the bonfire guests, testified that around 9:00 p.m., the Petitioner and his group arrived and went inside the house, that Mr. Good did not appear to be "overly intoxicated," and that at some point, Mr. Good asked everyone to leave. Adams, 2014 WL 3565987, at *4. She stated that the four men returned when their truck became stuck, that she refused to let the men use her truck, and that Mr. Good gave them the keys to his truck. Id. Ms. Hayes saw the victim asleep in a chair in the house and "wiggled" him twice throughout the evening in an attempt to rouse him, but he did not stir. Id. Mr. Good allowed two of the men to drive his truck offsite, and Ms. Hayes left the property around midnight. Id. Mr. Good called Ms. Hayes the following afternoon and did not mention that the victim had been killed. Id. at *5

Chris Cozart testified that after spending time with Mr. Blair, Mr. Estes, and the Petitioner in the afternoon, they went to Mr. Good's house because Mr. Blair needed to collect money from him. Adams, 2014 WL 3565987, at *5. The men saw that Mr. Good was having a party, drove up to the house, and entered. Id. Mr. Cozart recalled seeing the victim playing pool inside. Id. After about one hour, Mr. Good asked everyone to leave. Id. When Mr. Cozart left the house, the victim was awake, alert, and seated in a chair in the corner of the pool room. Id.

Mr. Cozart testified that Mr. Estes drove his truck into some trees, and after they were unable to tow the truck with Mr. Good's truck, Mr. Cozart and Mr. Estes drove to the Petitioner's house to retrieve Mr. Cozart's truck. Adams, 2014 WL 3565987, at *5. Mr. Estes wrecked Mr. Good's truck, and Mr. Cozart was "not in good shape" after the accident. Id. The two men walked the rest of the way to the Petitioner's house, and although Mr. Cozart's memory of events was not clear after that, he remembered riding with Mr. Estes back to Mr. Good's house, retrieving Mr. Estes's truck, and returning to the Petitioner's house. Id. at *6. Mr. Cozart fell asleep on the Petitioner's couch. Id. When he awoke, the other three men were asleep near him, and Mr. Cozart asked Mr. Estes for the keys to Mr. Cozart's truck. Id. Mr. Estes told him the truck was "messed up," and the truck had "fresh dents, blue paint on the bumper, and a blown-out tire." Id.

Mr. Blair testified that he pled guilty to the second-degree murder and aggravated robbery of the victim. Adams, 2014 WL 3565987, at *6. His version of events was similar to that of Mr. Cozart. Id. Mr. Blair drank beer, smoked marijuana, and took Xanax at the Petitioner's house. Id. After Mr. Estes had wrecked his truck, Mr. Good approached Mr. Blair and the Petitioner "and began screaming that Mr. Estes had stolen Mr. Good's truck." Id. Mr. Good threatened to kill them, and Mr. Blair and the Petitioner ran to the roadway, where they encountered Mr. Estes and Mr. Cozart in Mr. Cozart's truck. Id. The four men returned to Mr. Good's house to retrieve Mr. Estes's truck, and then they went to the Petitioner's house and continued to drink alcohol and smoke marijuana. Id. Later, the Petitioner stated that he wanted to return to Mr. Good's

-3-

house and "kick his a--" for threatening them, and the group, minus Mr. Cozart who was asleep, drove to Mr. Good's house in the Petitioner's car. Id. The Petitioner brought a .410-caliber shotgun and a .22-caliber pistol. Id. The Petitioner carried the shotgun, and Mr. Estes carried the pistol. Id. The Petitioner fired a shot into the air and reloaded the shotgun while he ran toward the back door of the house. Id. The Petitioner ran into the house; Mr. Blair went to the back window; and Mr. Estes shot through the back door of the house twice. Id. Mr. Estes handed the pistol to Mr. Blair, who shot through the window four times. Id. The Petitioner ran into the pool room, turned to the right, and fired a shot. Id. Mr. Blair saw the victim leaning over the pool table with blood on him. Id. The Petitioner went out the back door of the house, opened the screen door, and "stuck the gun in there and shot again." Id. at *7 Mr. Blair stated that the additional shot hit the victim. Id. Mr. Blair went inside and saw the victim lying on the floor. Id.

Mr. Blair took the victim's wallet from his back pocket, thereby ripping the victim's pants. Adams, 2014 WL 3565987, at *7. The three men looked for Mr. Good inside the house but did not find him. Id. Mr. Blair gave the victim's wallet to the Petitioner and Mr. Estes when they reentered the Petitioner's car. Id. The men went back to the Petitioner's house, where the victim's wallet was thrown into a fire. Id. Mr. Blair did not know what happened to the money in the wallet. Id. The men continued drinking alcohol, smoking marijuana, and "snort[ing]" Xanax pills. Id. At some point after the shooting, the three men pulled Mr. Good's truck off an embankment and to a creek behind the Petitioner's house. Id.

The three men again returned to Mr. Good's house in Mr. Cozart's truck because the Petitioner said they needed to find Mr. Good. Adams, 2014 WL 3565987, at *7. Mr. Blair had the pistol in his waistband, and the shotgun was inside the Petitioner's car. Id. As they approached the house, someone yelled at them and began shooting at them. Id. Mr. Blair fired the pistol at the person; the men left; and Mr. Estes drove them to the Petitioner's house, where Mr. Blair fell asleep. Id. Mr. Cozart's truck had a flat tire from the shooting. Id. In spite of Mr. Estes's admonition not to tell anyone what had happened, Mr. Blair spoke to the police early the next morning and on subsequent multiple occasions. Id. Mr. Blair stated that although he gave multiple inconsistent statements, he was truthful the last time he spoke to the police, and he was certain the Petitioner shot the victim. Id. Mr. Blair noted that on an occasion before the shooting, he stole the Petitioner's .22-caliber pistol and sold it to an individual from whom the Petitioner eventually bought it back. Id.

Mr. Estes testified that he had been charged with the first-degree felony murder, second-degree murder, and especially aggravated robbery of the victim. Adams, 2014 WL 3565987, at *7. He had no agreement with the State in exchange for his testimony. Id. at *8. Mr. Estes's testimony regarding the sequence of events was similar to that of

-4-

Mr. Blair and Mr. Cozart. Id. Mr. Estes stated that when the four men first entered Mr. Good's house, he saw the victim asleep in a chair in the pool room. Id. Mr. Estes acknowledged that he wrecked his own truck and later, Mr. Good's truck. Id. Both Mr. Estes and Mr. Cozart were injured in the accident involving Mr. Good's truck. Id. As Mr. Estes and Mr. Cozart drove back to Mr. Good's house in Mr. Cozart's truck, the Petitioner and Mr. Blair ran onto the road outside Mr. Good's driveway and told Mr. Estes that they had to leave because Mr. Good had "threatened him because Mr. Estes had not brought Mr. Good's truck back." Id. After the men retrieved Mr. Estes's truck, they returned to the Petitioner's house, Mr. Cozart passed out inside, and after an interval in which Mr. Estes fell asleep, Mr. Blair woke him up. Id. Mr. Estes was intoxicated "to the passing out point" and followed Mr. Blair and the Petitioner to the Petitioner's car. Id. The Petitioner was carrying "stuff in his hands," and Mr. Estes saw a sawed-off .410 shotgun and a "pistol, revolver" in the car, both of which he knew belonged to the Petitioner. Id. The shotgun was in the front seat, and Mr. Blair had the pistol in the backseat. Id. at *9. Mr. Blair told Mr. Estes that they were going back to Mr. Good's house to "rob them." Id.

When they arrived, the Petitioner ran to the door near the pool room, and Mr. Blair ran to the pool room window. Adams, 2014 WL 3565987, at *9. The Petitioner ran in the door, shot the shotgun toward the chair where the victim had been sitting previously, and ran back out. Id. Mr. Estes heard the victim moaning in pain. Id. The Petitioner and Mr. Blair spoke, but Mr. Estes did not hear what they said. Id. Mr. Estes saw a "shadow like someone getting up" in the pool room, and Mr. Blair fired the pistol through the window four times. Id. Mr. Estes saw the victim walk slowly to the door, turn, and slide down the door. Id. The Petitioner "opened the door and put the gun in there and leaned back out and pulled the trigger and shot." Id. Mr. Blair and the Petitioner ran back in the house, and Mr. Blair leaned over the victim. Id. Mr. Estes did not enter the house to see what was in the pool room. Id.

The three men got into the Petitioner's car, and the Petitioner and Mr. Blair ran back into the house a second time, citing the need to find Mr. Good. Adams, 2014 WL 3565987, at *9. They returned; the Petitioner placed the shotgun between the front seats; and Mr. Blair passed the Petitioner a wallet. Id. The Petitioner threatened to kill Mr. Estes and Mr. Blair if they "told on him." Id. at *10. Once they were at the Petitioner's house, the Petitioner and Mr. Blair discussed building a fire, but Mr. Estes did not see a fire. Id. After sitting on the couch for about fifteen minutes, the Petitioner said that they needed to retrieve Mr. Good's truck "because of what had happened" and noted that Mr. Estes's fingerprints would be in the truck. Id. The Petitioner stated that if Mr. Estes "didn't want to go to jail [they] needed to get rid of the truck." Id. Mr. Blair and Mr. Estes towed Mr. Good's truck to a creek behind the Petitioner's house and pushed it in. Id.

-5-

After they had returned to the Petitioner's house, the Petitioner walked out the back door with the shotgun and pistol and said they needed to find Mr. Good. Adams, 2014 WL 3565987, at *10. Mr. Estes drove the three men back to Mr. Good's house in Mr. Cozart's truck. Id. Mr. Estes pulled around behind the house, and as he turned the truck around, he "ran over a TV that was laying in [the] yard and the tire started going flat." Id. Mr. Blair and the Petitioner ran toward the house, and Mr. Estes heard someone yell at them to leave. Id. Mr. Estes heard two "sharp loud rifle shots" from Mr. Good at the bonfire, and "three sharp pistol sounds and a .410 blast" from the Petitioner and Mr. Blair. Id. The three men hurriedly left and returned to the Petitioner's house around 4:30 a.m. Id. Mr. Estes fell asleep on the couch for about one hour before Mr. Cozart awakened him by asking for his truck keys. Id. Mr. Estes informed Mr. Cozart of the flat tire and told Mr. Cozart that Mr. Cozart "was drunk and got up in the middle of the night and drove around . . . then he c[a]me back." Id. at *11.

Mr. Estes gave three police statements beginning on the evening of October 4, 2009, in which he gave increasing amounts of information about the evening's events. Adams, 2014 WL 3565987, at *11. The last statement included "everything that happened." Id. He told the police that his fingerprints would be on the pistol's barrel because he handed the gun from Mr. Blair to the Petitioner in the Petitioner's car but that he did not possess the pistol at Mr. Good's house. Id.

Wilson County Sheriff's Deputy Scott Filson testified that he responded to Mr. Good's house the morning of October 4, 2009, and spoke to Mr. Good on his front porch. Adams, 2014 WL 3565987, at *11. Mr. Good indicated that the victim, who was deceased, was inside the house. Id. Deputy Filson noted that the victim's body was in the pool room. Id.

Detective Jeff Johnson collected the following physical evidence from the scene: "spent .410 shotgun shells outside the pool room door; wadding from .410 shotgun shells in the backyard and inside the pool room . . . and three spent .22-caliber shell casings near the fire pit[,]" a small piece of cotton type material, and Mr. Good's .22-caliber rifle. Adams, 2014 WL 3565987, at *11-12. He also photographed the victim's body and ripped rear pants pocket, as well as the crime scene generally. Id. at *12. He sent the physical items to be tested by the Tennessee Bureau of Investigation (TBI) laboratory. Id.

TBI Special Agent Chet Mason testified that he responded to Mr. Good's house, spoke with Mr. Good, and determined that Mr. Blair was a potential suspect. Adams, 2014 WL 3565987, at *12. When Special Agent Mason interviewed Mr. Blair the following day, Mr. Blair showed him a pair of blue jeans with blood on them, confessed

-6-

to "being a party to the victim's murder," and implicated the Petitioner and Mr. Estes. Id. Special Agent Mason obtained a search warrant for the Petitioner's house, which was executed on October 5 when the Petitioner was not at home. Id. A spent .410 shotgun shell was found near the front sidewalk, two pieces of shotgun wadding were found in the front yard, and two unfired .410 shells were found underneath the couch. Id. The Petitioner was found at another location, and he and his car were taken to his house. Id. On October 7, Special Agent Mason returned to search the fire pit at the Petitioner's house, and the Petitioner signed a "TBI waiver of constitutional rights to a search warrant." Id. Special Agent Mason recovered burned pieces of the victim's voter registration card and insurance card, four .410 shotgun shell brass caps, four .22-caliber shell casings, and three shotgun pellets. Id.

The Petitioner gave a statement to Special Agent Mason in which he generally recounted the evening's events but omitted any mention of shooting the victim or shooting into the house. Adams, 2014 WL 3565987, at *13. The Petitioner included that three weeks previously, his .410 sawed-off shotgun and .22 caliber pistol, a box of bullets for each firearm, and two ounces of marijuana were stolen from his house. Id. He had no explanation for the victim's insurance card being in his fire pit. Id. at *14. He averred that the last time he had used the fire pit was two or three weeks previously and that he had burned shell casings in the past. Id.

Special Agent Mason collected the victim's clothing and a blood sample from the medical examiner and took them to the TBI crime laboratory. Adams, 2014 WL 3565987, at *14. Special Agent Mason later took multiple statements from Mr. Estes and Mr. Blair, and he noted that both men's final statements were "consistent with the other facts and evidence." Id. Special Agent Mason reviewed phone records from Mr. Good and Mr. Blair and noted a phone call from Mr. Good to Mr. Blair at 12:18 a.m. on October 4, 2009, which lasted about two seconds. Id.

Lieutenant Ricky Knight participated in the search of the Petitioner's house and was present when Mr. Estes and Mr. Blair were initially interviewed. Adams, 2014 WL 3565987, at *14. Lieutenant Knight knew Mr. Blair from previous dealings. Id. Lieutenant Knight stated that Mr. Blair directed them to his blood-stained clothing and that Mr. Blair gave a statement to Special Agent Mason. Id. Lieutenant Knight noted that generally, initial statements were not the most complete and that "they don't tell you everything[.]" Id.

Dr. John Brently Davis of Forensic Medical Management Services performed the victim's autopsy and concluded that the cause of death was multiple shotgun wounds to the head and that the manner of death was homicide. Adams, 2014 WL 3565987, at *16. Dr. Davis noted that there were two wounds—one on the left side of the head at the ear,

and the other one below that and behind the ear.  Id.  The victim's left arm and chest and right hand were also injured by shotgun pellets.  Id.  The wound to the left ear was a "contact wound" that had been inflicted by a gun pressed to the victim's head, causing massive damage to the skull, brain, and right eye.  Id.

TBI Special Agent Shelly Betts testified regarding collecting the crime scene evidence.  Adams, 2014 WL 3565987, at *16.  She noted that there was a seven-inch shot pellet pattern on the screen door to the pool room and on the back wall of the pool room, as well as four bullet holes on the screen window and in the wall across from the window. Id.  The bullet holes on the screen contained vaporous lead residue, indicating that the firearm had been discharged from less than thirty-six inches from the screen.  Id.  The bullets had "hit the wall sideways after striking an intermediate target."  Id.  A rocking chair in the corner of the pool room contained a fired shotgun shell wad and a small amount of blood.  Id.  The TBI collected samples of the blood stain, a tire impression, a portion of the wall showing the shot pattern and another with the bullet holes, cigarette butts, .22-caliber bullets from the wall opposite the window and the adjoining room, and "reference ammunition" from the house.  Id. at *16-17.  Agent Betts noted "shot patterns" in the victim's sweatshirt and t-shirt and concluded that "at a minimum, the victim experienced a close contact shotgun blast around his left shoulder area and that he had been shot once around the elbow."  Id.  The shotgun shell wadding from Mr. Good's backyard, the wadding from the pool room chair and the pool room floor, and the wadding and unfired shells recovered at the Petitioner's house were all consistent with a Winchester .410-caliber firearm.  Id.  Agent Betts testified that all of the shotgun shell casings from Mr. Good's backyard and "all but one" of the casings from the Petitioner's house were fired by the same gun.  Id.  Agent Betts stated that two .22-caliber firearms were involved in this case, one being a .22-caliber rifle recovered at the crime scene.  Id.

Former TBI Agent Lauralee Staples collected blood from the Petitioner's car's steering wheel, and she found the victim's driver's license in the backseat floorboard of the Petitioner's car.  Adams, 2014 WL 3565987, at *17.  Former TBI Agent Patrick Ihrie testified that he tested the blood sample from the Petitioner's car and concluded that it matched the victim's DNA.  Id. at *18.

At the close of the State's proof, the trial court questioned the Petitioner under oath regarding his right to testify.  The Petitioner testified that he understood his right to testify or not testify, that he and trial counsel had discussed the advantages and disadvantages of both options, and that he did not want to testify.

The defense attempted to call Dewy Raymond as a witness, and a jury-out offer of proof occurred, during which Mr. Raymond testified that Mr. Estes threatened to "kill me

-8-

like he did Crow." The victim was also known by the nickname Crow. The trial court found that the statement was inadmissible hearsay and excluded his testimony.

During jury deliberations, the jury submitted two questions to the trial court: (1) "Each count is [decided, i.e.,] 1st degree Felony Murder . . . Then 2nd Degree . . . Then Especially Aggravated Robbery. IF Guilty of Each count -- Then No Lesser Offenses are Included?"; and (2) "Under Elements of Felony First Degree Murder -- That the Defendant Took such property From the Person of Another by the use of violence or putting the Person in Fear. Does this mean that [the Defendant] had to be the person that did this Act?"

Relative to the first question, the trial court read the question aloud to the parties and stated,

> Of course, the answer is, that's correct. So I'm going to give you gentlemen an option. I can go back there and tell them that it's clearly in the instructions that if they reach a unanimous verdict on the indicted count, which is in there, then they don't consider any lesser, or if you prefer, I'll bring them out here and give them the answer. But I'm just going to tell them what the instruction is all over again.

The prosecutor and trial counsel consented to the trial court's going to the jury room to deliver the instruction. Relative to the second question, the court read the question aloud and stated, "Of course, I think the correct answer is, under criminal responsibility, the answer is, no, that it had to be either [the Defendant] or someone [for whom] he was criminally responsible." The court asked trial counsel and the prosecutor if they agreed and if the court could go to the jury room to deliver the instruction. Both parties agreed.

Upon this evidence, the Petitioner was convicted as charged and sentenced to an effective life sentence. The Petitioner timely appealed and was represented by trial counsel on appeal.

This court affirmed the convictions on direct appeal, concluding that (1) a photograph of the victim's injuries was properly admitted; (2) the trial court properly excluded Dewy Raymond's testimony; and (3) the evidence was sufficient to support the Petitioner's convictions, specifically that the testimony of Mr. Blair and Mr. Estes was sufficiently corroborated by the physical evidence. Adams, 2014 WL 3565987, at *18-29. This court also noted that the State's theory at trial was one of criminal responsibility for both offenses. Id. at *25-29.

-9-

Relative to Mr. Raymond's testimony, at trial, the Petitioner sought to impeach Mr. Estes with the threat he made to Mr. Raymond, which occurred while Mr. Estes was in jail. Adams, 2014 WL 3565987, at *20. Trial counsel argued that the testimony was a statement by an accomplice and, when questioned by the trial court, did not argue that the statement was not offered for its truth; Mr. Raymond's testimony was found to be inadmissible. Id. at *20-22. This court concluded that the statement would have been admissible as a prior inconsistent statement under Tennessee Rule of Evidence 613(b) if Mr. Estes had been confronted about the inconsistent statement during cross-examination and denied it or claimed not to remember it. Id. Because counsel did not pursue this line of questioning with Mr. Estes, a proper foundation had not been laid. Id. at *23-24.

The Petitioner filed a July 29, 2015 pro se petition for post-conviction relief, which is not included in the appellate record. In a written order filed on August 10, 2016, the first post-conviction court summarily denied the Petitioner's petition as not having stated more than "bare allegations." This court reversed the order by written order dated December 6, 2016, and remanded the case for a hearing. Tommy Dell Adams v. State, No. M2016-01930-CCA-R3-PC (Tenn. Crim. App. Feb. 17, 2017) (order). Then-Presiding Judge Woodall authored a concurring opinion attached to the order, recommending that the post-conviction court recuse itself because it had already made findings of fact in its order dismissing the petition. Id. (Woodall, P.J., concurring). The first post-conviction court recused itself by written order dated February 10, 2017, and transferred the case to a trial judge in the 15th Judicial District. Our supreme court then issued an order on March 3, 2017, appointing the second post-conviction court (hereinafter "the post-conviction court") to hear the case. The post-conviction court appointed post-conviction counsel, who filed two amended petitions for post-conviction relief, and a hearing was conducted on December 4-5, 2017.

At the post-conviction hearing, the Petitioner testified that in his opinion, trial counsel was not effective at the trial or appellate level. He stated that on October 5, 2009, TBI agents pulled him over while he was driving. The agents towed the Petitioner's car to his house and transported the Petitioner there. He spoke to TBI Special Agents Mason and Wayne Jackson after being informed of his rights and served with a search warrant. The Petitioner "informed them" of his activities the previous day, and he noted that the agents had searched his home prior to his arrival. The Petitioner did not know what was taken from his house other than his car, a 1995 Buick Regal. The Petitioner was not arrested until sometime later and was initially represented by the Public Defender's Office.

Trial counsel was appointed to the Petitioner's case after his arraignment. Counsel came to see the Petitioner, the Petitioner gave counsel "[his] statement on what [he] did" on the night in question, and counsel "disclosed some of the discovery" to the Petitioner.

In particular, counsel showed the Petitioner statements from Mr. Blair and Mr. Estes and "a few other subpoenas as far as phone records[.]" The Petitioner noted, though, that some pages were missing from Mr. Blair's statement and in other parts of the discovery packet.

Relative to the defense theory, the Petitioner agreed that he and counsel developed the theory together. The Petitioner stated that his theory was as follows: "About two weeks prior to this, I had somebody break in my house. They stole some guns and some dope, and . . . I didn't know at the time who it was . . . but I had to end up buying a gun back from Mr. Blair's ex-girlfriend's aunt." The Petitioner agreed that part of the defense theory was to attack the "elements of criminal responsibility" for the actions of Mr. Blair and Mr. Estes by establishing that the Petitioner was not present with Mr. Blair and Mr. Estes the entire evening, that "little to no forensic evidence" tied him to the crime, and that inconsistencies existed in his co-defendants' statements. The Petitioner noted that Mr. Estes "even admitted to driving my car that night" and that neither Mr. Estes nor Mr. Blair implicated the Petitioner in their initial police statements.

The Petitioner testified that trial counsel did not attack Mr. Estes's credibility at the trial or impeach his testimony. The Petitioner opined that this was a substantial issue in the defense of the case because Mr. Estes's "testimony [didn't] even match the evidence that was found at the crime scene."

The Petitioner testified that the forensic evidence consisted of the victim's blood on his steering wheel and the victim's driver's license in the "side of the passenger side" of his car. The Petitioner testified that his fingerprints were not recovered on the shell casings or inside Mr. Good's house and that other than the blood in the Petitioner's car, no forensic evidence tied him to the case other than his co-defendants' statements and "burnt material found in the fire pit of [his] residence." He agreed that "plenty of people" had access to his house and that this fact was "brought out" at trial. The Petitioner also agreed that "plenty of people" had access to his car and that the trial testimony reflected that other people had been seen driving the Petitioner's car. The Petitioner stated that Mr. Estes made a prior statement in which he said he had driven the Petitioner's car, that trial counsel did not bring up the prior statement during Mr. Estes's cross-examination, and that it would have been important to do so because "inconsistencies add up[.]"

The Petitioner testified that in Mr. Blair's initial police interview, he blamed Mr. Good for the killing. The Petitioner stated that Mr. Good had "lacerations" on his face and that Mr. Good testified that he woke up with a rifle beside him and that he did not remember retrieving the rifle. The Petitioner further stated that photographs were taken of Mr. Good's face and that the photographs were not introduced at the trial because none of the detectives or TBI agents would admit to having taken the photographs. The

-11-

Petitioner testified that Mr. Good was not asked to identify himself in the photographs. The Petitioner stated that the photographs showed blood on Mr. Good's clothing and that "something happened to him." The Petitioner noted that one of the State's discovery documents showed that Mr. Good's clothing was collected but that at the trial, Special Agent Mason testified that Mr. Good's clothing was not collected or tested. The Petitioner stated that trial counsel impeached Special Agent Mason's testimony to "show the inconsistencies" in his statements. In the Petitioner's opinion, the introduction of the photographs would have led the jury to form reasonable doubt as to his guilt.

The Petitioner testified that to his knowledge, trial counsel did not "direct an investigation into the co-defendants" or into the physical evidence and that counsel's investigation "was the reports that the State provided " to them. The Petitioner stated that counsel and his investigator interviewed the Petitioner and that counsel visited the Petitioner once every three months prior to the trial. The Petitioner wrote to counsel several times requesting the missing discovery pages and for counsel to file a motion to suppress the "chain of custody on the vehicle." The Petitioner agreed that without the forensic evidence from the car, the only evidence against him would have been his co-defendants' statements, which were inconsistent, and that it would have led to a different jury verdict. The Petitioner did not believe counsel or his investigators interviewed "investigators and potential witnesses" because at the trial, counsel asked one or two witnesses if he had ever spoken to them and they responded negatively. The Petitioner opined that counsel did not effectively cross-examine the witnesses, especially his co-defendants.

The Petitioner testified that Dewy Raymond was the victim's nephew, that Mr. Raymond was incarcerated with the Petitioner and his co-defendants, and that while in jail, Mr. Estes admitted to Mr. Raymond that he shot the victim. The Petitioner stated that this was contrary to Mr. Estes's trial testimony and prior statements, that Mr. Raymond's testimony would have been beneficial to the Petitioner, and that Mr. Raymond's testimony was excluded at trial on the basis of hearsay. Mr. Raymond was called as a witness during an offer of proof, the State objected, and the trial court excluded the testimony. The Petitioner noted that on appeal, this court concluded that counsel had not laid a proper foundation for the introduction of the testimony and as a result, "they could not rule on" the issue.[3] The Petitioner opined that this testimony would have led to a different jury verdict. The Petitioner opined that trial counsel was ineffective in presenting the defense theory that the Petitioner was not present during the shooting.

---

[3] Post-conviction counsel and the Petitioner refer to the "Supreme Court" as having made this statement, but the only appeals in this case were made to this court.

The Petitioner testified that it was important for him to review the full discovery packet because "nobody [knew] except for [the Petitioner], and [he was] locked down all the time, so [he could] review everything and report back to [trial counsel]." The Petitioner stated that he listened "[b]riefly" to audio recordings of statements made to the TBI and that he did not get to listen to Mr. Estes's audio recording. The Petitioner said, though, that he listened to a twenty-minute excerpt of Mr. Blair's interview, which was two hours long. The Petitioner agreed that there was missing audio from Mr. Blair, who had given contradictory statements. Counsel did not "address with [the Petitioner]" how he was going to handle the missing audio at the trial. When asked how counsel explained the evidence to the Petitioner, the Petitioner stated, "He just kept asking me, what's the defense? How can I raise this as far as you not being there?" The Petitioner "show[ed counsel] in different testimony or different statements and different paperwork that at first [he was] not there but then all of a sudden [he was] there." Counsel told the Petitioner that the State had to prove the essential elements of the offenses and criminal responsibility beyond a reasonable doubt in order to convict him. Relative to jury instructions, the Petitioner stated that he and counsel reviewed them during the lunch break on the second day of trial. The Petitioner was concerned about the instruction on "admissions," which stated that the Petitioner's "statement that [he] made [was] acknowledgment of guilt and . . . that [he was] guilty of the crime" without qualifying the nature of the Petitioner's statement. Although the Petitioner did not raise his concern with counsel, he felt counsel should have reviewed the jury instructions and raised the issue at the motion for a new trial or on direct appeal.

Upon reviewing the trial transcript, the Petitioner learned that during deliberations, the jury had sent two questions to the trial court. The Petitioner was not brought out or informed that the jury had asked questions. The jury was not brought into the courtroom, and "the judge pulled the [prosecutor] and [trial counsel] into the courtroom and instructed them on the question that the jury had." The Petitioner recalled that the first question dealt with criminal responsibility, which was the "crux" of the case. The second question was whether "they [could] find [the Petitioner] guilty on first-degree and second-degree murder," a lesser-included offense. The trial court presented the prosecutor and counsel with two options—the court could speak with the jury in the jury room, or the court could call the jury into the courtroom and instruct them there. The prosecutor and counsel agreed for the court to speak with the jury in the jury room. The Petitioner agreed that counsel did not object and did not "preserve[] a record" of the questions, the answers given by the court, and whether the instructions were "in conformity with Tennessee Pattern [Jury] Instructions[.]" The Petitioner stated that he did not know whether mistakes were made in giving those instructions and that counsel "fell below standard in his representation . . . by not preserving those rights and that record." The Petitioner agreed that if there were a mistake in the jury instructions, it would have been "an issue for appeal[.]"

-13-

The Petitioner testified that although a subpoena had been issued for the telephone records of Mr. Good and Mr. Cozart, the records were never retrieved, and trial counsel did not attempt to obtain the records. When asked why the records were important, the Petitioner stated, "If you look at the phone records that [were] provided to us, Mr. Estes admitted calling people that night. Mr. Blair admitted calling people that night. They made phone calls when the alleged crime took place that could have shown who they called[.]" The Petitioner further stated that Mr. Estes had two telephones, that the police had both telephone numbers, and that only one number had been preserved and the records requested. The text messages from the telephone were not provided in discovery.

The Petitioner testified that he understood he had the right to testify and that counsel did not prepare him to testify. Counsel told the Petitioner that it would not be beneficial for him to testify and did not explain the benefits of testifying. Although counsel told the Petitioner "that regardless of his opinion" the Petitioner could choose to testify and the Petitioner expressed interest in testifying, because counsel did not prepare the Petitioner to testify, the Petitioner felt counsel "prevented" him from testifying. The trial court reviewed the Petitioner's right to testify with him at a hearing,[4] but the Petitioner stated that he relied on counsel's statements and chose not to testify. The Petitioner stated that if he had testified, he "could have brought up inconsistencies" regarding his statement to the TBI and that hearing a statement was "different than a statement being read from the TBI like a computer." The Petitioner further stated that he had a "story to tell," that he did not feel counsel properly advised him of the benefits and drawbacks of testifying, and that he followed counsel's lead when he signed a waiver of his right to testify.

The Petitioner testified that he had a prior conviction for simple possession of marijuana and a "pretrial diversion on a theft" that could have been expunged. He stated that he could not have been impeached using his criminal record.

The Petitioner testified that "a lot of alcohol and some drugs" were used the night of the killing, that intoxication was brought up in the trial testimony, and that "there was no impeachment on it." Counsel's examination regarding intoxication was limited to "asking how intoxicated [were] you, what did you consume that night, how many pills did you take, and how many drinks did you drink." Counsel asked Mr. Blair whether his alcohol or drug consumption could have affected his memory but did not ask Mr. Estes. The Petitioner felt counsel should have questioned Mr. Estes on the effect of his intoxication. The Petitioner stated that individually and cumulatively, he thought that the

---

[4] Referring to the prophylactic procedure outlined in Momon v. State, 18 S.W.3d 152 (Tenn. 1999), which is designed to ensure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent.

effect of counsel's errors amounted to ineffective assistance and that he was entitled to a new trial. The Petitioner denied having "hard feelings" against counsel or that his appeal was a personal attack.

Trial counsel continued to represent the Petitioner on direct appeal. Counsel told the Petitioner that he was appealing "some of the issues that [were] on record for trial[,]" including the exclusion of Mr. Raymond's testimony. The Petitioner stated that he raised the same issues to counsel that he raised in his post-conviction petition, and that he felt his concerns "fell on deaf ears[.]" In particular, the Petitioner wanted counsel to raise the issue of the trial court's communications with the jury and "issues regarding intoxication and impeachment based on the intoxication[.]" When asked whether the Petitioner asked counsel to raise the issue "with regards to the preservation of the record and the impeachment of Mr. Estes and . . . Mr. [Raymond] where he was not laying proper foundation," the Petitioner responded that he was not aware of "the impeachment process" at that time. The Petitioner agreed that he asked counsel to raise on appeal the prosecutors' statements during closing arguments and Special Agent Mason's remaining in the courtroom during a recess instead of being sequestered from other witnesses.

On cross-examination, the Petitioner testified that trial counsel was appointed about two months after the Petitioner was indicted in 2009. The Petitioner agreed that counsel filed a bond motion and that a hearing was held about one week after counsel was appointed. The Petitioner agreed that counsel acted promptly in that regard. The Petitioner agreed that counsel visited him and discussed the case, including bringing a copy of the discovery packet "early on[.]" The Petitioner agreed that counsel later brought the "total discovery" including the telephone records and interview recording, but he denied that counsel provided those items prior to trial. The Petitioner stated that he reviewed the full discovery packet in 2015 and that prior to trial, he "received a few items, but the majority of it [he] had to appeal . . . . [He] had to send a letter to the Board of Professional Responsibility in order to receive the rest of my discovery." After that letter was sent, counsel provided his complete file to the Petitioner.

The Petitioner agreed that although he may not have possessed the full discovery packet, counsel possessed it. The Petitioner also agreed that he received the missing page of Mr. Blair's written statement and "some of the items [he] asked for" before trial and that counsel was responsive to his request. The Petitioner further agreed that he reviewed those materials and made notes, which he copied and sent to counsel. The Petitioner identified a copy of pages from the discovery packet with his handwritten notes. The Petitioner stated that he and counsel briefly spoke about the issues he raised.

The Petitioner testified that his December 6, 2011 trial was held about two years after trial counsel was appointed and that counsel visited him about eight times before

trial, although he did not remember the exact number of visits. The Petitioner agreed that he and counsel spoke about whether the Petitioner would testify and that counsel's advice was that it would not help the Petitioner's case. The Petitioner stated, "[I]t is easier for somebody to explain [themselves] than it is a piece of paper . . . . [or] to hear somebody else reading a statement." The Petitioner identified his written statement. The Petitioner agreed that he would have testified regarding his statement, that his testimony would have had to confirm or be different from the statement, and that counsel advised him of the possibility of being cross-examined by the State. The Petitioner denied, though, that counsel explained "certain aspects of testifying, as far as getting on the stand and testifying." Moreover, the Petitioner agreed that counsel told him that if he made the same statements, it would not help him, but that if he made differing statements, it could be harmful.

The Petitioner identified the portion of the trial transcript in which the trial court examined him regarding his right to testify. The Petitioner acknowledged that he answered affirmatively when the court explained his right to testify and asked whether the Petitioner had the opportunity to discuss with trial counsel the advantages and disadvantages of testifying and not testifying. The Petitioner further acknowledged that he did not tell the court he had not discussed it with counsel or only discussed it briefly. The Petitioner recognized that he told the court that he had decided not to testify and that it was his choice.

Relative to his written statement, the Petitioner testified that the statement reflected his position that he was with his co-defendants earlier in the evening but not later, that the State entered the statement into evidence at the trial, and that the jury heard the statement. The Petitioner agreed that he understood he was "locked in on" the position he chose as his defense theory and that if he made a contradictory statement on the stand, "it wouldn't work[.]" The Petitioner agreed that the defense theory came from his written statement and that trial counsel was "going to have to argue what [the Petitioner had] already said[.]"

Relative to the statements of Mr. Blair and Mr. Estes, the Petitioner stated that both men admitted they were present at the crime scene. The Petitioner stated, however, that their initial statements indicated that the Petitioner was not with them. The Petitioner further stated that Mr. Blair "actually admitted that it could have been Mr. Good." The Petitioner agreed that trial counsel talked to the jury pool during voir dire about "why people might make different statements" and that during his opening statement, counsel highlighted the fact that Mr. Blair and Mr. Estes "change[d] their statements every time they open[ed] their mouth[s.]" The Petitioner further agreed that the prosecutor asked Mr. Blair about his multiple statements and that counsel cross-examined Mr. Blair about the statements "on several pages of the transcript" such that the trial court "stopped the

-16-

trial and gave an instruction to the jury about prior inconsistent statements in the middle of [Mr. Blair's] testimony[.]" The Petitioner agreed that Mr. Estes was questioned by the prosecutor and counsel regarding his multiple inconsistent statements, although the Petitioner noted that counsel "did not specifically say what the specifics of it was." The Petitioner acknowledged that two of the investigating officers were questioned about why suspects change their statements and that the State and counsel addressed the topic during closing arguments. Specifically, counsel argued that Mr. Blair and Mr. Estes were not credible due to their changing versions of events. The Petitioner maintained, however, that counsel did not attack "specifics of what the inconsistencies" were. The Petitioner acknowledged that the jury heard "all the information about how many times they changed their statements, as far as credibility and believability[.]"

The Petitioner did not recall Officer Filson's trial testimony that Mr. Good had scratches on his face, but after reviewing the trial transcript, he acknowledged that trial counsel cross-examined Officer Filson regarding Mr. Good's injuries and whether they looked "fresh." Officer Filson testified that he did not photograph the injuries because he did not carry a camera and that Mr. Good claimed to have been hit by an unidentified object and person at the bonfire. The Petitioner agreed that the jury was aware Mr. Good had "mysterious, unexplained injuries to his face[.]" The Petitioner acknowledged the State's direct examination of Mr. Good, in which Mr. Good was questioned about the nature of the injuries to his face and stated that he had a "scuff mark . . . like [he] had been whacked with something." Mr. Good further stated that he did not remember having had a fight and that he was not "prone" to fighting. The Petitioner further acknowledged Detective Johnson's testimony on cross-examination that Mr. Good had scratches on his face. The Petitioner agreed that although the photographs were not entered as an exhibit, the jury knew of Mr. Good's injuries and their unknown origin, and that the injuries were discussed in closing arguments. The Petitioner stated that trial counsel "briefly" cross-examined his co-defendants regarding their intoxication, including the quantity of alcohol and illegal substances they consumed.

Relative to Mr. Raymond's excluded testimony, the Petitioner testified that although the jury heard proof of other inconsistent statements made by Mr. Estes, Mr. Raymond's testimony would have made a difference in the verdict. The Petitioner acknowledged that the case was not based upon Mr. Estes's testimony alone and that the other evidence consisted of Mr. Blair's testimony, the blood on the steering wheel, the shotgun wadding at the crime scene and the Petitioner's house, the victim's driver's license in the Petitioner's car, and the cards from the victim's wallet in the Petitioner's fire pit. The Petitioner recalled the prosecutor's argument that the driver's license could not have been in the position in which it was found if three people had not been in the car. Although the Petitioner did not know the law regarding corroborating evidence, he was aware that the trial court instructed the jury regarding criminal responsibility and that

-17-

the physical evidence could "count" as corroborating evidence. The Petitioner agreed that counsel asked the investigating officers at trial why Mr. Good's clothing had not been collected and tested.

Relative to trial counsel's investigation of Mr. Blair and Mr. Estes, the Petitioner agreed that he met with counsel's two investigators in jail. The Petitioner acknowledged that at trial, one of the officers was questioned about his suspecting Mr. Estes's involvement in a prior "rash of vandalism" and that this information was not included in the State's discovery materials. The Petitioner did not remember if the State or counsel provided information regarding Mr. Blair's criminal history, which was discussed at the trial. The Petitioner agreed that counsel's sentencing brief was lengthy and that counsel worked hard on the Petitioner's behalf after the trial. The Petitioner agreed that at the time of the trial, he did not have "anything against" counsel and that their relationship was "[w]hat an attorney-client relationship ought to be[.]" The Petitioner stated, though, that "certain aspects" of the relationship were not appropriately formed.

The Petitioner testified that it "might be on record" that the officers attempted to take fingerprints from the pool room and that no fingerprints were recovered. The Petitioner agreed that counsel asked the officers about fingerprints. Relative to the phone records of Mr. Good and Mr. Cozart, the Petitioner stated that counsel told him they had the records, but the Petitioner denied that counsel told him he had reviewed the records and they contained nothing useful. The Petitioner agreed that he was complaining of counsel's failure to obtain Mr. Good's and Mr. Cozart's telephone records. The Petitioner stated that Mr. Estes's telephone records reflected multiple contacts with Mr. Cozart between the time of the crime until they were arrested. The Petitioner denied having asked counsel to obtain Mr. Good's and Mr. Cozart's telephone records. The Petitioner stated that counsel was "[f]airly" responsive to the Petitioner's requests during the representation. The Petitioner agreed that counsel filed a motion and obtained the missing page of Mr. Blair's statement.

Regarding the ex parte supplemental jury instructions, the Petitioner acknowledged that the trial court may have repeated his jury instructions verbatim as reflected in the trial transcript. Relative to text messages between the co-defendants, the Petitioner stated that they were not provided in the telephone records included in discovery.

The Petitioner testified that after his trial, counsel was four hours away from him and that their correspondence was limited to letters and "whenever [the Petitioner] appeared in court." The Petitioner agreed that he wrote to counsel regarding which grounds to include in the appeal, including Mr. Raymond's testimony, sufficiency of the evidence, and accomplice testimony, although he could not remember all of the grounds.

-18-

On redirect examination, the Petitioner testified that he had a ninth grade education, that he drafted his initial post-conviction petition in 2015, and that he "oversaw the appeal" in 2016 that resulted in a hearing being ordered. He stated that he trusted trial counsel and respected his opinion, even when they disagreed. The Petitioner filed two complaints with the Board of Professional Responsibility regarding counsel after the trial "just as a part of getting . . . discovery[.]" The Petitioner further stated that he did not realize there was a "deficiency" in his attorney-client relationship until he studied the matter further in prison. The Petitioner averred that it was not his job to tell counsel how to do his.

Upon questioning by the post-conviction court, the Petitioner testified that Mr. Blair entered a guilty plea with an agreed twenty-five-year sentence prior to the Petitioner's trial in exchange for his testimony. About eighteen months after the Petitioner's trial, Mr. Estes entered a guilty plea with an agreed fifteen-year sentence. When asked what counsel should have asked Mr. Estes on cross-examination, the Petitioner stated, "[T]here was a lot of inconsistencies in his statement. They don't even have the right amount of shots to the victim. The . . . medical examiner said there was at least three shots. The alleged co-defendants are claiming only two shots to the victim. They don't have nothing." The Petitioner agreed that nobody asked Mr. Estes about that or about Mr. Estes's prior statement that he drove the Petitioner's car. The Petitioner stated that his co-defendants testified inconsistently on direct and cross-examination and agreed that it was beneficial to him that they "look[ed] like liars[.]" The Petitioner agreed with the post-conviction court that "the jury weighed [the inconsistencies] and still convicted [the Petitioner] even though they may have looked like liars[.]"

Relative to the photographs of Mr. Good's injuries, the Petitioner testified that the photographs revealed "it wasn't just a scratch. It was a deep cut[.]" The Petitioner noted that no one would admit to having taken the photographs and that this was a problem with counsel's investigation. The Petitioner acknowledged that the Administrative Office of the Courts paid for two investigators in his case. The Petitioner stated that they each wrote a short report and that he did not see the reports until after the trial. The Petitioner was not aware whether a full recording of Mr. Blair's videotaped statement existed, although he knew he only saw a portion of it because the recording began while Mr. Blair was in the process of speaking. The Petitioner said that he saw the motion for a new trial before the hearing and that he "may have" contacted counsel prior to the hearing to request that counsel raise more issues.

On further recross-examination, the Petitioner agreed that the jury was informed that Mr. Blair had entered a plea and that Mr. Estes did not have an agreement with the State at that time. The Petitioner acknowledged that the investigators' reports were dated

prior to his trial, although he did not know if counsel received the reports before the trial. The Petitioner admitted that he had access to audio recordings and written statements based upon the recordings in discovery. He stated that "at the time [he] wasn't aware what was in the audio, if it was a completely different statement or . . . the same thing," although he also stated that to his knowledge, no differences existed between the recording and the written report.

Detective Jeff Johnson testified that on October 3, 2009, he was called to the crime scene by patrol officers, that he examined the scene and called for assistance, and that he was present when the TBI was called to assist them later that day. Upon his arrival, Detective Johnson took an initial statement from Mr. Good inside the house. When asked whether Mr. Good was a suspect, Detective Johnson responded, "Well, they're all suspects until they can be eliminated." Detective Johnson stated that Mr. Good's face had "superficial scratches" and that Detective Johnson did not know much about the scratches until he "was showed some photographs during the trial." Detective Johnson denied having photographed Mr. Good's face, and he stated that Detective Stafford or Detective Knight took the photographs.

Detective Johnson remained a part of the investigation and stated that Mr. Blair, Mr. Estes, and the Petitioner were identified as suspects through "witness statements," although Detective Johnson was not present during any of the interviews. Special Agent Mason and other detectives conducted the interviews. Detective Johnson did not interact with the Petitioner and was not aware of any collection or request to collect the co-defendants' cell phones.

Special Agent Mason testified regarding his investigation of the Petitioner's involvement in the crime, including interviewing Mr. Blair and Mr. Estes, who made multiple inconsistent statements. Special Agent Mason noted, though, that both men consistently identified the Petitioner as having been present. The men later stated that the Petitioner drove to and from the crime scene and shot the shotgun. Special Agent Mason noted that the group of men consumed beer, whiskey, marijuana, and Xanax on the night in question and that the combination of substances could impair one's judgment, the "ability to realize what's going on around you," and memory. Special Agent Mason agreed that Mr. Estes and Mr. Blair gave statements "until the key points matched[.]" Special Agent Mason testified that at the time he interviewed Mr. Blair, Mr. Estes, and the Petitioner, he "did typewritten interviews" and did not typically record them. Special Agent Mason learned at a later date that a portion of his interview with Mr. Blair was recorded. Special Agent Mason did not know why only a portion of the interview was recorded.

Trial counsel testified that he was a retired Lieutenant Colonel in the United States Air Force, that he served in the military for twenty years, that he completed law school at George Mason University School of Law during his service, and that he began practicing law in 2000. Before his military retirement in 2003, counsel handled pro bono cases through Legal Services of Virginia. In 2003, counsel moved to Tennessee and accepted a position as an Assistant Public Defender. During his time there, counsel handled "[e]verything from misdemeanors to murder cases" and tried several cases, including ones involving Class A felonies. Counsel agreed that he gained "extensive" experience with filing motions. Counsel left the Public Defender's Office in January 2009 to establish his own firm; at the time of the post-conviction hearing, his physical office was in Davidson County, but he had a "virtual office" in Carthage. Counsel agreed that he could be contacted through an attorney in Carthage with whom he had an office-sharing agreement and that he met with clients and received mail and telephone calls there. Counsel stated that his practice was seventy-five percent criminal defense and twenty-five percent civil cases. Counsel practiced in the 15th, 16th, and 20th Judicial Districts. Counsel agreed that since 2009, he had handled Class A felony cases and murder cases and that some of the murder cases had been tried. Counsel recalled a murder case in Nashville involving a "home invasion" in which he obtained an "absolute acquittal" for his client. Counsel stated that he had a "lot of experience" in criminal law.

Trial counsel testified that he was appointed to the Petitioner's case on November 10, 2009, and that he met the Petitioner about one week after "because it was such a serious case." Counsel argued a bond motion on November 18, 2009, because the Petitioner did not have "much of a criminal record," he denied involvement in the offenses, and "most of the evidence" consisted of the co-defendants' statements. The Petitioner was in favor of requesting bond. The motion was denied, and the Petitioner remained at the Wilson County Jail. Counsel identified a copy of the jail records that listed counsel's jail visits with the Petitioner between the time just before he was appointed and the trial, which reflected twenty-four visits.[5] Counsel noted that he also saw the Petitioner in court on November 18 and December 8, 2009; that he went to the jail and attempted to see the Petitioner on September 17, 2011, but was not able to do so due to time constraints; and that the Petitioner's trial was December 6-8, 2011.

Trial counsel testified that he visited the Petitioner more frequently than he would other clients due to the seriousness of the crime. Counsel agreed that he visited the Petitioner more frequently than once every ninety days. Counsel identified a copy of the court docket, which reflected that between the time counsel was appointed and the trial,

---

[5] November 5 and December 17, 2009; February 6 and 29, April 1, July 9, September 22 and 30, November 10, and December 23, 2010; March 11, April 20, May 8, 23, and 25, June 28, August 3 and 18, November 15, November 18, November 23, December 1, 4, and 5, 2011.

the Petitioner was in court ten times.[6]   Counsel estimated that he saw the Petitioner about twice per month.[7]

Trial counsel testified that in the 15th Judicial District, the District Attorney's Office had an open file policy under which counsel could also look through the prosecutor's file to ensure nothing was forgotten in discovery.  Counsel agreed that from "time to time," things were missing from the prosecutor's file.  If counsel discovered a missing document, he would call and ask for it, look through the file himself, or file a motion listing the items requested if he felt it appropriate.

Trial counsel testified that he received the State's discovery packet, reviewed it, and provided a copy to the Petitioner.  The Petitioner reviewed the file and made handwritten notes on his copy, which counsel reviewed with him.  Counsel agreed that he and the Petitioner discussed discovery and stated that "from time to time [the Petitioner] would say what about this or what about that and [counsel] would have written a letter or requested it."  Counsel identified a handwritten letter from the Petitioner to him, in which the Petitioner described his relationship to various people involved in the case and provided his theory of what happened and why his co-defendants would have framed him for the murder.  Counsel stated that he attempted to "do the things that [the Petitioner] was asking for" in the letter.

Trial counsel testified that he moved for and received funding from the trial court for two investigators, Edward Mason and Malcolm Crawford.  Counsel had worked with Mr. Mason on other cases and had used him as an investigator since the Petitioner's case. Counsel identified a December 7, 2009 letter to Mr. Mason enclosing the order approving funding for investigative services.  Mr. Crawford assisted Mr. Mason and counsel on the case.  Mr. Mason and Mr. Crawford were former police officers, and counsel provided both of them with a copy of the discovery materials and asked them to review it and convey to counsel "where [they] needed to go to try to find additional information." Counsel agreed that he relied upon the investigators' professional opinion regarding possible gaps in the discovery materials.  Counsel asked the investigators to research certain individuals and to try to find additional witnesses, as well as reviewing the police reports "and see if they were consistent with  . . . what police officers do and what would have been the logical progression for the investigation and also to find conflicts within the statements."  The investigators completed all these tasks.

---

[6] November 10 and 18, 2009; January 12, April 1, May 10, July 12, September 13 and 27, 2010; January 25, and September 2, 2011.

[7] The record reflects, including days the Petitioner saw counsel in court, thirty-four visits over the twenty-six months between counsel's appointment and trial.

Trial counsel testified that he determined a couple of pages were missing from one of the police statements and "some other items [were] missing" from the discovery packet. Counsel identified an April 12, 2010 letter to Mr. Mason enclosing additional discovery materials counsel obtained. Counsel identified an August 9, 2010 letter to the prosecutor requesting a list of ten items to be supplemented in discovery, including page four of Mr. Blair's third police statement, a telephone record subpoena, photographs of Mr. Good's facial injuries, and any existing recordings of witness interviews.

Trial counsel testified that he subsequently met with the prosecutor and that one or both of the investigators attended. Counsel reviewed the prosecutor's file, found the missing items for which he was searching, and asked questions. Counsel agreed that based upon that meeting, he was "able to clear up that list of items" he wanted. Counsel identified a letter to Mr. Mason in which he attached a letter from the Petitioner and the discovery materials. Counsel noted that he met with the investigators "fairly regularly" to discuss the case. Counsel identified an August 23, 2010 letter he sent to the Petitioner, attaching page four of Mr. Blair's third police statement and "item #35" from the discovery materials. The letter stated that new evidence was presented to counsel at the meeting with the prosecutor and that counsel and the investigators were reviewing it.

Trial counsel testified that on October 6, 2010, he sent Mr. Mason a copy of a court order granting an additional $3,000 for the investigators to continue to work on the Petitioner's case. Counsel agreed that he and the investigators did "quite a bit of investigation" and stated that he filed a motion to declare the Petitioner's case complex and extended. Counsel noted that the case "was taking a number of hours that was well beyond what the [c]ourt would normally approve for this type of case." Upon questioning by the post-conviction court, counsel stated that the Administrative Office of the Courts approved his request for attorney's fees beyond the statutory cap.

Relative to the defense theory, trial counsel testified that the Petitioner felt strongly about his initial statement "basically exonerat[ing] him from the actual murder." Counsel continued,

> we did an investigation and made sure it was supportable in general . . . [so] we decided that the theory . . . was these two guys basically threw him into the case because they had been friends forever and [the Petitioner] was just a new person they had an acquaintance with and there [were] enough things about their involvement with him that would indicate they might be willing to do something like collude and try to blame him for something he wasn't involved in. So the theory was that they had colluded to put [the Petitioner] as the trigger man to help themselves get out of it.

-23-

Counsel agreed that the defense theory was aided by the co-defendants' relationship and the fact that one of them entered a plea agreement. Relative to Mr. Good, counsel stated that no evidence tied him to the offense "more than being there and around" and that his theory was that Mr. Blair and Mr. Estes had always had a problem with Mr. Good. Counsel further stated that any conflict between the men was between Mr. Good, Mr. Blair, and Mr. Estes, and that the Petitioner was not necessarily involved. Counsel noted that just as Mr. Cozart "was around these guys the whole time and he fell asleep and . . . he was never charged[,]" the Petitioner fell asleep at his house and should not have been charged. Relative to Mr. Good's injuries, counsel said that they "showed that there could have been something else going on with Mr. Blair and Mr. Estes . . . but it was just that he couldn't explain himself and [the defense was] looking for any things that would indicate that the whole story was not being told."

Trial counsel testified that the Petitioner's police statement was introduced at trial and that if the Petitioner testified, he would have to "contend with" the statement. If the Petitioner had testified inconsistently with the statement, it would have hurt his credibility. Counsel noted the defense's argument that the Petitioner "cooperated 100 percent of the time. He signed two waivers to allow them to search at [his] home." Counsel denied that the Petitioner had raised the issue of his signature being forged on one of the search consent forms on any occasion prior to the post-conviction petition. Counsel agreed that the Petitioner's cooperation with the police supported the defense theory and that the defense theory "came from" the Petitioner.

Trial counsel testified that as the trial date neared, he filed motions, including motions based upon his review of the discovery materials and conversations with the investigators and the Petitioner. Counsel denied that the Petitioner asked him to file a particular motion or that he refused to file such a motion. Counsel noted that he knew what he needed to file "because of . . . specific things like preferential agreements, notes from the detectives . . . , exculpatory evidence . . . but . . . there [were] no motions that [the Petitioner] indicated [counsel] needed to file or issues [counsel] needed to address that motions would have been necessary to file."

Trial counsel testified that he and the investigators separately interviewed the Petitioner on more than one occasion to hear his version of events. Counsel discussed with the Petitioner his right to testify, including that the Petitioner's initial statement "exonerated him," that the statement could not be disproven based upon the State's evidence, and that if the Petitioner testified inconsistently with the statement, it could hurt him. Counsel did not want the Petitioner to be subject to "rigorous cross-examination" unless "he really felt he needed to testify[.]" Counsel advised the Petitioner that it was his choice but that in counsel's opinion, he did not "know that [the defense] need[ed] him to testify." Counsel did not know going into trial whether the Petitioner would testify. After the conclusion of the State's proof, counsel again discussed the co-defendants'

inconsistent statements, the fact that the Petitioner's statement "had not been fully impeached," the Petitioner's right to testify, and counsel's recommendation that he not testify. The Petitioner decided not to testify. Counsel denied refusing to allow the Petitioner to testify or saying anything indicating the Petitioner did not have a choice to testify.

Trial counsel testified that he believed he kept the Petitioner informed of the evidence and the sufficiency of the evidence in his case. Counsel agreed that he reviewed discovery with the Petitioner and formed an appropriate attorney-client relationship with him. Counsel denied any animosity existing between him and the Petitioner at trial or at the post-conviction hearing. Counsel recalled receiving text messages in the discovery materials, but he "saw nothing that aided in [his] effort to defend" the Petitioner and chose not to present them at trial. Counsel agreed that he discussed the witnesses' inconsistent statements at length at the trial. Counsel discussed with the Petitioner the issues he intended to raise on appeal, and he did not recall the Petitioner's asking him to raise specific issues.

Trial counsel testified that he attempted to authenticate the photographs of Mr. Good's injuries in two or three witnesses' testimonies and that none of the witnesses were able to authenticate the photographs. As a result, the photographs were not admitted, although Mr. Good testified about his injuries, and counsel discussed them during closing arguments. Counsel agreed that the jury was aware of the "mysterious, unexplained injuries[.]"

Trial counsel testified that at trial, he asked to recall Deputy Filson as a witness and that the trial court stated if Deputy Filson was not present or subpoenaed, the trial would proceed. Deputy Filson had testified regarding Mr. Good's injuries, and counsel wished to question him in an attempt to authenticate the photographs of the injuries.

Trial counsel testified that he and the Petitioner discussed cross-examining the witnesses regarding their levels of intoxication; that Mr. Estes and Mr. Blair had smoked marijuana, taken pills, and consumed alcohol that night; and that they smoked marijuana at the Petitioner's house. Counsel identified his cross-examinations of Mr. Blair and Mr. Estes in the trial transcript. Mr. Blair admitted under questioning that he may not have remembered everything that happened because he was intoxicated. Mr. Estes stated under questioning that prior to wrecking the trucks, he had "[p]robably a good [twelve, thirteen] beers, quite a bit of liquor," and later stated that he had "[f]our, five, six" shots of liquor, as well as snorting one Xanax pill. Counsel agreed that he "brought all that out" at trial and that the jury was aware that "these people were very impaired that night." Counsel noted that Mr. Estes also testified relative to his level of intoxication during direct examination.

Trial counsel identified his cross-examination of Detective Ricky Knight in the trial transcript. Counsel stated that he elicited from Detective Knight information regarding the criminal histories of Mr. Estes and Mr. Blair, including Mr. Blair's guilty plea to aggravated burglary and Mr. Estes's suspected involvement in "mailbox vandalism."

Trial counsel testified that he cross-examined Mr. Blair and Mr. Estes regarding their prior inconsistent statements, as reflected on a combined twenty-three pages of the trial transcript. Counsel recalled the prosecutor's eliciting testimony from the testifying police officers, including Special Agent Mason and Detective Knight, regarding reasons why suspects change their statements over time. Counsel agreed that the jury heard multiple times that Mr. Estes and Mr. Blair had changed their statements "on numerous occasions[.]" Counsel and the prosecutor addressed this fact during voir dire, opening statements, witness testimony, and closing arguments. Counsel read into the record a portion of his closing argument, in which he emphasized that the co-defendants' statements had changed every time they were interviewed, including their trial testimony, and that they had progressively placed more responsibility on the Petitioner and off of themselves.

Relative to the trial court's instructions to the jury during deliberations, counsel could not remember whether the Petitioner was present. Counsel noted, however, that it would be uncommon for the court to address the parties without the Petitioner's being present and that counsel would ask the court for the Petitioner to be brought in if he had been absent. Counsel stated that in the transcript, he did not request for the Petitioner to be brought into the courtroom. Counsel agreed that the court told the parties his intended instructions to the jury and that counsel felt a proper record had been formed. Counsel agreed with the prosecutor to allow the court to go into the jury room and repeat its instructions to them. Although counsel "[p]robably wouldn't do it the second time[,]" he did not see a problem with this procedure. To counsel's knowledge, the court gave the same instructions to the jury as it stated in open court. Counsel stated that the court generally gave pattern jury instructions and that abnormal or extraordinary instructions were not given. Counsel further stated that the court gave instructions on conspiracy, facilitation, and accomplice testimony on counsel's request. Counsel agreed that the court sua sponte gave an instruction on prior inconsistent statements. The court gave the parties an opportunity to request additional instructions before instructing the jury.

Relative to the direct appeal, trial counsel chose issues he thought "would make a difference . . . and the ones that would carry the day[.]" He reviewed the issues with his associate, who was not involved in the investigation but sat second chair at the trial, and the Petitioner. Counsel noted that his associate performed legal research. Counsel stated that his decision to appeal or not appeal certain issues was strategic and based upon his

understanding of the law and what had been successfully appealed in the past. Counsel noted that the Petitioner's case did not involve "a whole lot of novel issues[.]"

Trial counsel attempted to present Mr. Raymond's testimony, but the trial court held that counsel had not laid a proper foundation for the testimony and as such, it would have been hearsay. Counsel explained that although he asked Mr. Estes if he had confessed to the crime to anyone, counsel did not specifically ask whether Mr. Estes told Mr. Raymond he had killed the victim. Counsel was surprised by the adverse ruling and believed he had laid a proper foundation; as a result, he appealed the issue. This court affirmed the trial court's ruling. Counsel did not know whether Mr. Estes would have denied making the statement if he had been specifically asked about it.

Trial counsel testified that he did "everything within reason" to prepare for the Petitioner's trial. Counsel felt his pretrial investigation was adequate and noted that they were not able to interview some individuals because the individuals refused to speak to them. Counsel felt that he provided effective assistance and "actually thought [they] had a shot at the end of the trial, that [they] might get a lesser[-]included [offense] or an acquittal on some of the charges." Counsel agreed that the jury chose to believe Mr. Blair and Mr. Estes's multiple versions of events.

On cross-examination, trial counsel testified that he disclosed the investigators' findings to the Petitioner. He did not recall whether he gave the Petitioner copies of the investigators' reports but stated that they discussed the information discovered by the investigators. Counsel believed the Petitioner had a good understanding of the evidence. Counsel stated that no plea offer was made in this case and that although he attempted to "foster an offer[,]" the Petitioner did not want to discuss a plea offer.

When asked why trial counsel did not recall Mr. Estes in order to lay the foundation for Mr. Raymond's testimony, counsel testified that Mr. Estes had been sent back to prison and that counsel believed they would prevail on the issue on appeal. In hindsight, counsel acknowledged that he would have preferred to have recalled Mr. Estes, but he stated that at the time, he thought he had laid the proper foundation.

When asked why it was important to create a record of the jury's questions during deliberations, trial counsel testified, "[Y]ou always want . . . your client to hear what's going on and to be present . . . . I want him to be present and he heard it in the record." Counsel stated that the trial court's statement of what it intended to tell the jury was the only assurance of what was said in the jury room. Counsel agreed that instructing the jury on the record and in the presence of a court reporter would have been better for the Petitioner and that counsel would have been able to "address any appealable issues had [the trial court] stepped outside the scope of that."

Trial counsel denied that his visits with the Petitioner were as brief as five minutes. Counsel stated that initially, he did not provide compact discs in the discovery materials to the Petitioner and that after the Petitioner requested the full discovery file through the Tennessee Board of Professional Responsibility, counsel gave the Petitioner his full file and reviewed it with him.

Trial counsel stated that he reviewed with the Petitioner the elements of the offenses with which the Petitioner was charged and the State's burden of proof. Counsel stated that he discussed with the Petitioner the possibility that he would testify "and what it would entail" and that the investigators also spoke to the Petitioner about his testifying. Counsel explained that preparing the Petitioner to testify consisted of telling him that he was "going to have to stick to this story. You can't change it. You can't deviate from it. Are you comfortable with that?" Counsel stated that they reviewed the Petitioner's story multiple times and had him go "line by line, to make sure he was consistent with that story." Counsel thought that the Petitioner understood the benefits of testifying, including that "as [the Petitioner] stated, he thought a live person saying something would carry some weight." Counsel thought the Petitioner understood the drawbacks of testifying because they had discussed that if he made an inconsistent statement, his credibility would come into question. Counsel acknowledged that the Petitioner had never deviated from his story; however, counsel was concerned that the prosecutor "might be able to get him confused" about his version of events. Counsel stated, though, that if the Petitioner had testified consistently with his statement, "that would have been great." Counsel agreed that the Petitioner had a "miniscule" criminal record and that he could not have been impeached based upon his record. Counsel noted that although the Petitioner had been charged previously with theft, a crime of dishonesty, the theft charge could have been expunged.

Edward Mason testified that he had been a private investigator for eleven years and that previously, he was a police officer and sergeant with the Nashville Police Department for thirty-two years. In December 2009, Mr. Mason owned a private investigating company and had associates who worked with him, including Mr. Crawford. Mr. Mason and Mr. Crawford worked on the Petitioner's case together. Mr. Mason noted that the trial court and the Administrative Office of the Courts had to approve work on the Petitioner's case and that the first document he received in this case was the court order containing the "approved amount of services[.]" Trial counsel provided Mr. Mason the discovery materials "on several occasions." Mr. Mason estimated that he and trial counsel met between ten and twenty times. Counsel "gave [the investigators the] direction that he wanted [them] to go from the information [they] had"; the investigators made suggestions; and counsel advised the investigators if they needed

to interview additional people. Mr. Mason identified an invoice in which the investigators' hours on the case were itemized.[8]

Mr. Mason spent four hours reviewing the case file on December 19, 2009; four hours meeting with trial counsel to review the case file on February 10, 2010; and six hours meeting with the Petitioner, counsel, and Mr. Crawford on February 24, 2010. During the February 24, 2010 meeting, the investigators "just sat back and listened." At a later date, the investigators visited the Petitioner with additional questions. Mr. Mason was not able to interview every witness identified by the Petitioner or in the discovery materials because some had "dropped off the radar" and others refused to speak to him. Mr. Mason and Mr. Crawford reviewed letters from the Petitioner that were given to "someone [they] had interviewed" and others that counsel received. The investigators went to the crime scene and because Mr. Good was not at home, noted "what was outside that [they] could see" in regards to the layout of the property. The investigators also spent "several hours" trying to locate witnesses based upon their work and home addresses. The investigators updated counsel over the phone about their findings. On another occasion, the investigators spent six hours looking for witnesses. The investigators met with counsel to discuss the case, and they gave counsel written reports based upon their interviews with witnesses. The investigators met with counsel at the district attorney's office to review the prosecutor's file. Although Mr. Mason did not recall whether documents had been missing in the initial discovery packet, he stated that generally, it was normal for some to have been missing. Mr. Mason said that they received additional discovery and added it to the case file. On December 3, 2010, the investigators spent seven hours re-interviewing the Petitioner at the jail about the chronology of the day of the offense. In January 2011, Mr. Mason performed another witness search.

In March 2011, Mr. Mason revisited the crime scene, and a person at the house informed him that the house had been remodeled and did not reflect the layout of the house on the night of the incident. He noted, though, that he came back when no one was home and looked through the windows and that the house did not appear to have been renovated. Mr. Mason examined the outside of the house as well as the locations where Mr. Estes's and Mr. Good's trucks were wrecked, and he left business cards at the neighbors' houses. Mr. Mason did not think that they spoke to anyone on that occasion, and as a result no reports were generated. Although the investigators surveilled Mr. Good's mother's house in an attempt to locate and speak to Mr. Good, they were unable to contact him. In July 2011, the investigators met with sheriff's deputies to review the case file. In November 2011, the investigators reviewed who they had and had not been

---

[8] The invoice reflected that the investigators billed for ninety-seven hours between December 19, 2009, and December 6, 2011.

able to interview and received instructions from trial counsel regarding for whom they should continue to search. On December 2, 2011, the investigators searched for a witness based upon a new witness list, but the individual refused to speak to Mr. Mason. On December 6, 2011, counsel prepared Mr. Mason and Mr. Crawford in case they were called as witnesses at trial.

When asked how much direction the investigators received from trial counsel, Mr. Mason testified that they were given specific instructions in this case to look for certain individuals who counsel felt were relevant. Mr. Crawford accompanied Mr. Mason during much of the investigation, as well as doing the paperwork and maintaining the case file. Upon questioning by the post-conviction court, Mr. Mason stated that the invoice included all his and Mr. Crawford's work on the case.

Mr. Crawford testified that he worked with Mr. Mason in 2009 on the Petitioner's case. Mr. Crawford reviewed the discovery material and "marked what [they] needed, missing documents[.]" Mr. Mason and Mr. Crawford worked together and separately. Mr. Crawford recalled meeting with trial counsel several times in person and by telephone. Mr. Crawford felt their working relationship with counsel was "collaborative." Mr. Crawford visited the crime scene multiple times in order to examine the outside of the house and yard, find the location of the crashes, and search for witnesses. Mr. Crawford wrote investigative reports detailing the interviews they conducted and gave them to counsel. Mr. Crawford identified lists he made of potential witnesses and evidence not included in the State's discovery packet. Mr. Crawford identified two March 8, 2010 lists he gave to counsel of pending and completed tasks. Mr. Crawford identified a copy of the TBI report from Mr. Good's interview, which contained Mr. Crawford's handwritten notes. Mr. Crawford identified nineteen pages of handwritten notes from a seven-hour interview with the Petitioner.[9] Mr. Crawford testified that the only things that the investigators "wished" they had been able to do was examine the interior of Mr. Good's house and speak to witnesses who refused to talk to them. He noted, however, that they tried to do everything they could in that regard.

On cross-examination, Mr. Crawford testified that he examined both the fire pit at Mr. Good's house and the "fireplace" or fire pit at the Petitioner's house. Mr. Crawford was never asked in his testimony preparation to be able to offer proof regarding the ease of access to the fire pit. He understood that the State had found some evidence in the fire pit.

---

[9] The Petitioner stipulated to the length of the notes and their nature, but because post-conviction counsel was not provided a copy of the notes in advance, the post-conviction court admitted them for identification only and placed them under seal. After reviewing the notes, it is not necessary to elaborate on their contents here other than to confirm that they set out a detailed timeline of events on the date of the offense.

The post-conviction court thereafter denied the Petitioner relief by written order filed on February 27, 2018, finding that all witnesses aside from the Petitioner were credible and concluding that the Petitioner had failed to establish his claims of ineffective assistance of counsel. This timely appeal followed.

ANALYSIS

On appeal, the Petitioner submits that the post-conviction court erred when it denied him relief. The Petitioner's issues are laid out as follows:

Whether the trial court erred in dismissing [the Petitioner's] Petition for Post-Conviction Relief due to the following deficiencies of counsel:

(1) Failure to present a cohesive defense theory; failure to properly investigate the case; failure to perform quality interviews of [the Petitioner] and other witnesses; and failure to make [the Petitioner] aware of the evidence/sufficiency of evidence in case;
(2) Failure to object to the trial court's ex parte communications with the jury as it related to two jury questions during deliberations;
(3) Failure to properly advise [the Petitioner] whether or not to testify;
(4) The effect of trial counsel's deficiencies on direct appeal; and
(5) The totality of deficiencies of trial counsel's representation of [the Petitioner] collectively amount to ineffective assistance of counsel and to which the cumulative effect prejudiced [the Petitioner] at trial and on appeal.

The State responds that the post-conviction court correctly concluded that the Petitioner failed to prove ineffective assistance.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim."

-31-

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id. We apply the Strickland test to claims of ineffective assistance of trial counsel as well as ineffective assistance of appellate counsel. Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to

-32-

whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness.  Id. at 457.

1.  Defense Theory, Investigation/Attorney-Client Relationship, Explanation of Evidence

The Petitioner contends that trial counsel (1) failed to "properly present a cohesive defense" at trial; (2) did not properly investigate the case by failing to spend "more time developing an appropriate attorney-client relationship with [the Petitioner] by and through interviews with the [Petitioner] regarding the specifics of this case in an effort to assist direction of his investigators and their subsequent [witness] interviews"; and (3) "was unsuccessful in explaining relevant evidence in this case . . . and the sufficiency of that evidence."

The Petitioner states, without citation to supporting facts, that "[h]ad trial counsel properly investigated the case and directed his investigators to make better use of their time and efforts, the trial proceedings would be different and the jury would have reached a different result."  Similarly, the Petitioner argues that  "counsel's deficiencies prejudiced [the Petitioner] and, as a result of those prejudices, there is a reasonable probability that the results of the proceeding would have been different."

The State responds that the Petitioner has not shown how additional investigation would have changed the outcome of the trial and cites the post-conviction court's findings that the defense theory was reasonable and that counsel did his best to advance that theory.  The State does not address the Petitioner's arguments regarding the attorney-client relationship or counsel's explanation of the sufficiency of the evidence.

The post-conviction court accredited the testimony of all witnesses other than the Petitioner.  We will not disturb on appeal the court's findings relative to witness credibility.  See Fields, 40 S.W.3d at 456.  The court found that trial counsel and the investigators met with one another and the Petitioner to discuss the evidence and develop a defense strategy.  Counsel testified that the strategy was to mirror the Petitioner's police statement, which asserted that the co-defendants committed the offenses and that he was not present. The Petitioner felt strongly about maintaining his innocence.  The post-conviction court found that the defense theory was reasonable and that "trial counsel did his best to advance this theory before the jury."

The record reflects that the defense theory was developed during lengthy meetings with the Petitioner in jail.  At trial, counsel attempted to cast doubt on the Petitioner's involvement in the crime by cross-examination of the co-defendants, particularly regarding their inconsistent statements, and counsel argued the Petitioner's innocence to

-33-

the jury using the co-defendants' statements, the Petitioner's statement, and the Petitioner's consistent cooperation with the police.

We disagree with the Petitioner that a defense theory premised upon the Petitioner's innocence is "incoherent," and the Petitioner has provided no evidence to suggest this theory was unreasonable. Instead, his argument centers on the proposition that counsel failed to find unspecified further evidence to support his innocence. The evidence does not preponderate against the post-conviction court's finding that the defense theory was reasonable and that counsel did his best to advance the defense theory. Counsel provided effective assistance in developing and advancing the defense theory, and the Petitioner is not entitled to relief on this basis.

Relative to investigation, the post-conviction court accredited the testimony of trial counsel, Mr. Mason, and Mr. Crawford that they met "extensively" with one another and the Petitioner to identify potential issues. Counsel and the investigators "investigated the potential issues in great detail," and counsel "thorough[ly]" cross-examined the State's witnesses on these issues. The court found that counsel's "effective handling" of the issues at trial established that his investigation prepared him to defend the Petitioner.

The record reflects that trial counsel, Mr. Mason, and Mr. Crawford testified at length regarding their efforts in investigating this case, including the investigators' documented ninety-seven hours of work and counsel's twenty-four jail visits with the Petitioner. Counsel, Mr. Mason, and Mr. Crawford all attempted to interview as many witnesses as were identified, but some witnesses could not be located or refused to speak with them. Mr. Mason attempted to examine the crime scene multiple times and was eventually denied entry. Counsel, Mr. Mason, and Mr. Crawford similarly reviewed all the discovery materials to look for gaps, and they met with the prosecutor's office to review the full file, ask questions, and fill those gaps. The Petitioner was also provided with the documents obtained during this visit. When new discovery materials were given to counsel near the time of trial, the investigators were directed to follow up on new leads and attempted unsuccessfully to contact one additional witness.

The Petitioner has failed to establish that this case was insufficiently investigated. The unwillingness of potential witnesses to cooperate with the investigation does not establish deficiency on counsel's part. Further, the Petitioner did not introduce at the post-conviction hearing any purported evidence that counsel would have discovered during further interviews or investigation. See Black v. State, 794 S.W.2d 752, 757 (Tenn. 1990) ("It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense

-34-

counsel."). Counsel provided effective assistance in his investigation, and the Petitioner is not entitled to relief on this basis.

Relative to the attorney-client relationship and trial counsel's explanation of the sufficiency of the evidence, the post-conviction court found that jail visitor logs established trial counsel's "frequent[]" meetings with the Petitioner before trial. The court accredited counsel's testimony regarding the trial preparation and found that counsel "discussed evidence, strategy, and other salient issues . . . [and] explored all issues as instructed by [the] Petitioner. [The Petitioner's] assertion he had no meaningful attorney-client relationship with [counsel] is simply not borne out by the credible evidence presented at the post-conviction hearing and present in the trial record."

We note that at the hearing, the Petitioner gave no evidence of information in his possession that might have been obtained had counsel spent more time interviewing him. We cannot speculate on the existence of possible facts that could have changed the course of counsel's investigation and, subsequently, the jury's verdict at trial. See Black, 794 S.W.2d at 757.

The record reflects that trial counsel met with the Petitioner thirty-four times in the twenty-six months between counsel's appointment and the trial, which includes twenty-four jail visits and ten court appearances. Mr. Mason's invoice documented two interviews with the Petitioner that were multiple hours in length, the first of which was attended by counsel. The post-conviction court discredited the Petitioner's assertion that counsel visited him once every ninety days. Although the Petitioner testified that he was not able to review some unspecified pieces of evidence in discovery before the trial, his testimony was discredited. The post-conviction court accredited counsel's testimony that he provided his entire file to the Petitioner and kept the Petitioner apprised of the evidence.

The evidence does not preponderate against the post-conviction court's finding that counsel appropriately developed an attorney-client relationship with the Petitioner during his pretrial incarceration and explained the relevant evidence to him. This finding is amply supported by the State's evidence at the post-conviction hearing. The Petitioner is not entitled to relief on this basis.

2. Right to Testify

The Petitioner contends that trial counsel was ineffective for failing to "properly advise [the Petitioner] of his rights to testify and to prepare him for such testimony." The Petitioner argues that counsel "neither took the time or effort to go through the

advantages and disadvantages of testifying" and that the Petitioner's testimony "would have assisted his defense and led the jury to a different result."

The post-conviction court accredited trial counsel's testimony that he and the Petitioner discussed the Petitioner's potential testimony "extensively up to the moment of trial [when the] Petitioner made his decision." The court found that counsel "gave [the] Petitioner well-reasoned advice not to testify" and that the Petitioner chose not to testify after being "fully informed" of his rights and the potential consequences of testifying. The court also discredited the Petitioner's testimony that he was not fully informed.

The record reflects that trial counsel and the Petitioner discussed the possibility of his testifying multiple times and that counsel informed the Petitioner that he would have to be consistent with his police statement in order for the testimony to be helpful. Likewise, the Petitioner was informed that he would be subject to cross-examination and that any inconsistencies in his story could damage his case. The Petitioner was further aware that the jury would have access to his written statement, in which he claimed his innocence. The Petitioner reviewed his version of events with counsel and the investigators multiple times before trial in the event he chose to testify. Our review of the Momon hearing reflects that the Petitioner affirmed to the trial court that he had been adequately informed of his rights and that he chose not to testify of his own volition. The evidence does not preponderate against the post-conviction court's finding that counsel provided effective assistance in this regard. The Petitioner is not entitled to relief on this basis.

3. Ex Parte Jury Communications by the Trial Court

The Petitioner contends that trial counsel rendered ineffective assistance by failing to object to the trial court's issuing supplemental jury instructions in the jury room instead of in open court. The Petitioner argues that because the court's instructions were not reduced to writing, "there is no record to render a fully informed decision" and, therefore, prejudice must be presumed. The State responds that the evidence does not preponderate against the post-conviction court's finding that the Petitioner did not establish prejudice.

The post-conviction court found that the trial court did not follow the "appropriate course of action" for answering jury questions, which is to "bring the jurors back into open court, read the supplemental instruction . . . along with a supplemental instruction emphasizing that the jury should not place undue emphasis on the supplemental instructions, and then allow the jury to resume its deliberations." See State v. Bowers, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001). However, applying a harmless error analysis, the post-conviction court found that neither the trial court nor any jurors had testified at

the post-conviction hearing and that no evidence had been presented to suggest the trial court deviated from its proposed instructions. The post-conviction court found that the proposed instructions were "fair and accurate statements of the law" and that the Petitioner failed to prove prejudice.

Both the Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a defendant's right to an impartial jury. "'The impartial jury guaranteed by constitutional provisions is one which is of impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting [the] defendant with the commission of the crime charged.'" State v. Hugueley, 185 S.W.3d 356, 377-78 (Tenn. 2006) (quoting State v. Lawson, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990)). A claim that the defendant's "right to an impartial jury was compromised can be based on an allegation that the jury was exposed to extraneous prejudicial information[.]." State v. David Brian Howard, No. M2016-02256-CCA-R3-CD, 2017 WL 4051134, at *9 (Tenn. Crim. App. Sept. 13, 2017).

The United States Supreme Court has stated that "the primary if not exclusive purpose of jury privacy and secret is to protect the jury's deliberations from improper influence." United States v. Olano, 507 U.S. 725, 737-38 (1993). The Supreme Court and our supreme court have held that statements from judges and court officers carry special weight with juries and, as a result, court officials should not make ex parte statements to jurors regarding substantive law, the facts, or opinions about a case. Parker v. Gladden, 385 U.S. 363, 365 (1966) (holding that a bailiff's commenting to a juror his opinion that the defendant was guilty was prejudicial); Walsh v. State, 166 S.W.3d 641, 650 (Tenn. 2005) ("Court officers act as representatives of the court, and they must recognize the official character of their position will cause their comments to carry great weight in the eyes of the jury. Thus, we again stress the importance of closely guarding all comments made in the presence of jurors."). Supplemental jury instructions should be given in open court and on the record. See Guy v. Vieth, 754 S.W.2d 601, 605 (Tenn. 1998).

This court has repeatedly emphasized that "trial courts should discontinue the practice of communicating ex parte with deliberating juries." State v. Gregory Randall South, No. M2018-01360-CCA-R3-CD, 2019 WL 4777858, at *7 (Tenn. Crim. App. Sept. 30, 2019) (Ogle, J., concurring); see State v. Art Mayse, No. M2004-03077-CCA-R3-CD, 2006 WL 1132082, at *8 (Tenn. Crim. App. Apr. 27, 2006) (concluding that "[t]o prevent even the appearance of judicial partiality or unfairness, any proceeding involving the jury after it has retired for deliberations should be conducted in open court and in the defendant's presence.") (citing State v. Tune, 872 S.W.2d 922, 929 (Tenn. Crim. App. 1993); Smith v. State, 566 S.W.2d 553, 559-60 (Tenn. Crim. App. 1978)).

Although trial counsel testified that he did not perceive a problem with the trial court's communicating supplemental instructions to the jury ex parte, he acknowledged that hindsight advised against his agreeing to such a procedure again. Counsel's experience with the trial court was that the court adhered to the pattern jury instructions, and no abnormal instructions were present in this case. Counsel did not articulate a tactical reason for agreeing to an inappropriate procedure. We find that counsel was deficient in this regard.

However, the fact that an ex parte communication occurred does not automatically necessitate reversal. This court must examine the record to determine if the communication influenced the verdict and prejudiced the defendant or, conversely, whether the communication was harmless. See Olano, 507 U.S. at 737-40 ("We generally have analyzed outside intrusions upon the jury for prejudicial impact."). In cases where it is not apparent from the record whether the statements were prejudicial, this court may remand the case to the trial court for a hearing and additional findings of fact. State v. Nicholas Wyatt Barish, No. E2012-01353-CCA-R3-CD, 2013 WL 5436909, at *19 (Tenn. Crim. App. Sept. 27, 2013).

In support of his argument, the Petitioner avers that this court's opinion in Barish dictates that the trial court's communication was presumptively prejudicial and, by extension, prejudice did not have to be proven at the post-conviction hearing. In Barish, the jury returned a unanimous guilty verdict for first-degree murder; however, it became apparent that an earlier verdict for second-degree murder had been issued by the jury and then returned by the trial court outside of the courtroom. Barish, 2013 WL 5436909, at *9. The following exchange occurred between the court and the parties:

[Defense counsel]: I don't know how to do this. I mean, they sent one in, it was second and a few minutes later said first.

The [c]ourt: Well the -- it was sent back telling them that that's an illegal verdict. I can't accept the verdict . . . of second degree unless they acquit as to felony murder which is the law. That is in the instructions -- they cannot consider the second count until -- unless they acquit as to the first.

[The prosecutor]: He can ask for an individual polling if that's their verdict.
The [c]ourt: That was explained to them twice. I can't -- well, I can do that. I can ask individually . . . are the felony murder verdicts your verdict. If you want me to do that, I can.

-38-

. . . .

[Defense counsel]: It's bizarre.

The [c]ourt: Well, . . . they had some disagreement. I think they probably . . . implicitly, I think some felt more comfortable with second-degree murder but when they found out they could not find him guilty of second-degree without acquitting him of felony murder, they were unwilling to do that because they actually thought he did commit felony murder.

The trial court proceeded to poll the individual jurors with respect to their verdict of guilty to felony murder . . . . Each of the jurors agreed that guilty was their verdict[.]

Id. at *9.

At the motion for a new trial, the defendant argued that the trial court had improperly influenced the jury's verdict and erred by failing to read the initial second-degree murder guilty verdict in open court. Barish, 2013 WL 5436909, at *10. The defendant asserted that the trial court should have "sent back a note explaining the difficulty with the first verdict and requesting a correction. Defense counsel pointed out that the jurors may not have understood the nature of the error they had made in the first verdict." Id. The defendant argued that the jury had spent nine and one-half hours deliberating before the first verdict and "only a few minutes" deliberating before issuing the second verdict, indicating that the jury had misinterpreted "whatever communication had come from the judge." Id. While denying the motion, the trial court clarified what had transpired:

With regard to the problem with the problem with the verdict form, I didn't try to explain the sequence of time when I was explaining to you all what had happened. The jury sent back a question at one point and I quoted it in -- when we were receiving the verdict. The question was, "[i]f not unanimous on felony murder do we move on to second-degree murder or hung jury?" And the response I gave them was to underline the portion of the instructions dealing with how they deliberate. And that they -- before they can move to any lesser[-] included offense they must acquit as to the greater offense. And that is Tennessee's law at the present time.
. . .
And so the verdict form -- or the form that they finally circled and the jury foreman signed was not a valid legal verdict. Now the [c]ourt -- when the [c]ourt told them first of all, by underlining the instructions, told them, no,

-39-

you can't do it that way, you must acquit as to the greater offense, and then when they presented me with the verdict form where they had circled second degree, and had not acquitted on the charged offense, and I sent it back to them. I was not refusing a valid legal verdict. At least in this [c]ourt's opinion I was not. That was not a valid legal verdict. Had it been, I would've immediately brought [it] into court.

In retrospect I wish I had brought that form into the court and let you all see it and be aware of what was going on as I made the decision to do what I did. But I think I did what I had to do, and I don't believe it is outside influence. I believe as the general stated, it's not outside influence for the [c]ourt to instruct the jury as to how to deliberate and how to render a verdict. That's what the [c]ourt has to do and is supposed to do. So I don't believe there was any kind of outside influence involved.

Id. at *10-11.

On appeal, this court noted that "the record does not reveal exactly what transpired in the court below" other than the jury's changed verdict, the dialogue between defense counsel and the trial court, and the court's admitted ex parte contact with the jury during its deliberations. Barish, 2013 WL 5436909, at *17. This court condemned such behavior, stating as follows:

At a minimum, then we must conclude that the trial court in this case engaged in an ex parte, off-the-record contact with the jury during its deliberations and, for reasons that will forever remain shrouded in mystery, the jury changed a previously-issued verdict (whether legal or not) following that ex parte contact. This is not an acceptable sequence of events in a criminal trial.

Id. This court noted the great weight a judge's comments carry with a jury and concluded that ex parte communications "concerning substantive matters of law and pertinent matters of procedure" during jury deliberations "necessarily raises eyebrows[.]" Id. at *18. This court stated, "[W]hen the inevitable ex parte contact between jurors and judges does occur, it should not include any statements concerning the relevant law or facts of the case at hand." Id. (citing Walsh v. State, 166 S.W.3d 641, 650 (Tenn. 2005)) (explaining that court "[o]fficers must carefully guard against making any statements of law or prejudicial comments to jurors").

This court continued, "We recognize that once an improper influence on jury deliberations has been shown, reversal may still not be required if the defendant has

-40-

suffered no prejudice." Barish, 2013 WL 5436909, at *18 (citations omitted). This court also noted that "a strong argument could be made that the proper remedy in this case is to remand the case back to the trial court to conduct a hearing concerning whether the ex parte contact between the trial judge and the jury was prejudicial." Id. at *19. However, this court concluded that "[o]n the record before us, it appears extremely likely -- and certainly 'reasonably possible' -- that the trial judge's ex parte contact altered the jury's verdict." Id.

As a preliminary matter, Barish was a direct appeal. In this case, we are presented with the issue in the context of ineffective assistance of counsel, where a different burden applies. The burden in a post-conviction proceeding is on the Petitioner to prove the allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. Simply put, the Petitioner must establish that, but for trial counsel's deficiency in agreeing to the trial court's improper actions and not preserving the issue for appeal, (1) the jury's verdict would have been different, or (2) this issue would have been successfully litigated on appeal.

Relative to the effect of the communication on the jury's verdict, although this court correctly discussed in Barish that "proof of an improper influence creates a presumption of prejudice," we do not think Barish creates a rule that the mere existence of an ex parte communication from a trial court during deliberations triggers the presumption of prejudice. That is to say, the influential nature of the communication must be evident from the record.

To be clear, this type of ex parte communication during deliberations is highly inappropriate, and we caution judges against utilizing such a procedure. Jury questions, problems with the legality of the verdict, and any similar issues should be addressed on the record in open court and in the presence of the parties, accompanied by limiting instructions regarding the weight given to any supplemental jury instructions. See State v. Bowers, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001). However, we decline to presume prejudice from every ex parte communication between a judge and jury, and we will examine the unique facts of this case to determine whether there was a reasonable possibility that the ex parte communication influenced the jury's verdict to the Petitioner's prejudice.

This case is distinguishable from Barish in that the influential nature of the trial court's communication is not apparent from the record. In Barish, the jury changed its verdict from second-degree murder to first-degree murder only a few minutes after the ex parte communication, before which it had deliberated for nine and one-half hours. In this case, the record does not reflect how long the jury deliberated before or after each of the

-41-

two questions were answered, but the verdict was only issued once and did not change. In addition, unlike the trial court in <u>Barish</u>, the trial court in this case reviewed with the parties what it intended to convey to the jury and obtained their consent before communicating with the jury.

The Petitioner did not call as witnesses the trial judge, who had recused himself from the post-conviction proceedings and would have been able to testify, or any of the jurors. As a result, we do not have a record of what the jury was told other than the court's otherwise proper proposed instructions. Trial counsel testified that he did not know that any improper commentary by the court occurred and that his experience with the court was that the court adhered to the pattern jury instructions. Without establishing that the trial court deviated from its proposed instructions, the Petitioner has not proven by clear and convincing evidence that the court improperly influenced the jury. As a result, the Petitioner has not demonstrated that the communications affected the jury's verdict.

Relative to the viability of the issue on appeal, if counsel had objected to the ex parte communication, a presumption of prejudice would not have necessarily attached on appeal and would have depended on this court's assessment of the adequacy of the record. At most, this court could have remanded for a hearing for more findings of fact, but the facts of the Petitioner's case, standing alone, do not have the indicia of improper influence such that a presumption of prejudice would have applied. As stated above, the Petitioner did not present evidence at the post-conviction hearing establishing that influential comments were made to the jury. The Petitioner has not proven by clear and convincing evidence that he would have been entitled to a new trial if the issue had been properly preserved. Consequently, although trial counsel was deficient for failing to request that the jury be brought in for the supplemental instructions, the Petitioner has not proven that the issue would have been successful on appeal. The Petitioner is not entitled to relief on this basis.

4. <u>Ineffective Assistance of Counsel on Direct Appeal</u>

The Petitioner's argument regarding the direct appeal challenges the following actions by trial counsel, including (1) objecting to "false and misleading statements by the State"; (2) failing "to make proper preparations for the testimony of Josh Cook [sic] at trial and strategically address any hearsay issues"; (3) failing to "lay a proper foundation during Mr. Estes'[s] testimony which resulted in the jury failing to hear significant testimony in his defense"; and (4) "allowing the trial judge to communicate ex parte with a jury while deliberating . . . without requesting the supplemental instruction even be memorialized to a writing." The State responds that the Petitioner has waived consideration of these issues for failure to support them with sufficient argument and

citation to the relevant authorities. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We agree with the State.

In determining whether appellate counsel's failure to raise an issue on appeal constitutes ineffective assistance of counsel, our supreme court has held that "unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim." Carpenter v. State, 126 S.W.3d 879, 887-88 (citing United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir. 1993)). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel" as these are "tactical and strategic choices," which should not be second-guessed. Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).

As a preliminary consideration, the issues as stated do not relate to trial counsel's representation of the Petitioner on direct appeal. Rather, they relate to the issue of ineffective assistance of counsel at trial, specifically trial counsel's duty at trial to preserve issues for appeal by creating a record. Because this issue is unsupported by relevant argument, it has been waived.

However, we note trial counsel's testimony that his selection of issues to raise on appeal was tactical and based upon his understanding of appellate precedent and which issues had been successfully appealed in the past. The most relevant appellate opinion on point, Barish, was not filed until after counsel filed his brief in this case. The case law was not as established in this area at the time of the Petitioner's direct appeal.

Moreover, the Petitioner has not proven that the failure to raise the issue on appeal was prejudicial. This court would have examined the issue for plain error. The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

The trial record did not establish that a substantial right of the Petitioner was adversely affected because it was not clear from the record that the trial court improperly influenced the verdict or that the jury changed its verdict as a result of the ex parte communication. In addition, we note trial counsel's testimony at the post-conviction hearing that his experience with the trial court was that the court generally used pattern jury instructions, and no abnormal instructions were given in this case. Counsel agreed to the procedure and, although hindsight advised against doing so in the future, he did not see a problem with his having agreed to this procedure. The record therefore does not indicate that consideration of the error must be "necessary to do substantial justice." Plain error relief would not be warranted in this case. As a result, the Petitioner has not established that this issue would have been successful on appeal, and he is not entitled to relief on this basis.

5. Cumulative Deficiency

The Petitioner contends that "a multitude of errors too enumerated to individually address in the body of this appeal"[10] occurred, such that the totality of the errors had a prejudicial effect "at both the trial and appellate levels." The State responds that because trial counsel was not deficient in any respect and the Petitioner has not proven prejudice, no cumulative error occurred.

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). In the post-conviction context, the Petitioner argues that even if counsel's alleged deficiencies did not, standing alone, prejudice him, the aggregate effect of the deficiencies is sufficient to establish prejudice for purposes of ineffective assistance of counsel.

As a preliminary matter, we note that the Petitioner includes a laundry list of alleged errors by counsel unsupported by citations to the record or argument, other than the Petitioner's statement that he has "raised the following issues as deficiencies in trial/appellate counsel's performance and the totality of the errors has a cumulative effect of prejudice at both the trial and appellate levels." Those issues are, in addition to the issues raised above, (1) the failure to call Josh Crook as a witness or perfect an offer of proof to "preserve this issue for appeal"; (2) the failure to impeach the co-defendants and argue their credibility to the jury; (3) the failure to "call witnesses"; (4) the failure to

---

[10] We note that it is necessary in an appellate brief to enumerate and individually address every error alleged, regardless of the multitudinous number of issues.

challenge the chain of custody of physical evidence; (5) the failure to object to "erroneous/inflaming statements" made by the State in closing; (6) the failure to identify the source of Mr. Good's photographs and introduce them at trial; and (7) the failure to object to "violations of the Rule of Sequestration."

In so much as the Petitioner's issues are not supported by citations to the record or relevant authorities, they are waived. Tenn. Ct. Crim. App. R. 10(b)  In addition, we feel constrained to note that a bare laundry list of allegations, without supporting proof, cannot establish ineffective assistance on the basis of cumulative error. See Carl Ronald Dykes v. State, M2006-02771-CCA-R3-PC, 2008 WL 109123, at *8 (Tenn. Crim. App. Jan. 10, 2008), perm. app. denied (Tenn. May 5, 2008).[11]

Relative to cumulative error, the post-conviction court found that because "none of counsel's actions constituted ineffective assistance of counsel," the Petitioner had not been denied a fair trial. We note that the post-conviction court's language inaccurately characterizes the cumulative error standard.  If any one of counsel's actions had constituted ineffective assistance of counsel, cumulative error analysis would not have been necessary because a new trial would have been granted on that ground alone.

Cumulative error examines the prejudicial effect of multiple instances of deficient performance and, contrary to the State's assertion, the post-conviction court implicitly found more than one instance of deficient performance in this case.  Specifically, the court implicitly found deficiency in counsel's failure to lay a proper foundation for Mr. Raymond's testimony and in counsel's agreeing to the ex parte communication with the jury.  We agree with the post-conviction court's determination in this regard.  We will, then, review whether those errors' combined effect caused prejudice to the Petitioner.

We agree with the post-conviction court that trial counsel was deficient in failing to lay the foundation for Mr. Raymond's testimony and that this deficiency was not, standing on its own, prejudicial, as Mr. Raymond's testimony highlighted one inconsistent statement by Mr. Estes in a trial rife with inconsistent statements.  Likewise, we have already concluded above that counsel's failure to object to the trial court's ex parte communication with the jury was deficient and that the prejudicial nature of the communication was not proven.

However, we cannot conclude, in light of the forensic evidence and accomplice testimony in this case, that the Petitioner would have enjoyed a better outcome at trial had

---

[11] Regarding the above-listed issues in this section, our review of the record does not reveal any evidence preponderating against the post-conviction court's findings that counsel did not render ineffective assistance.  We note that none of the complained-of absent witnesses or missing pieces of evidence were introduced at the post-conviction hearing.  See Black, 794 S.W.2d at 757.

counsel introduced Mr. Raymond's testimony and the court delivered its supplemental instruction in open court. We note that the State's theory of the case revolved around criminal responsibility. Even if reasonable minds differed on which man shot the victim, both co-defendants testified that the Petitioner was with them during the offense; Mr. Good testified that he saw three men at his house that night; and the forensic evidence tied the Petitioner's car and house to the crime scene. This court affirmed the sufficiency of the evidence on direct appeal, and neither deficiency on counsel's part affected the State's evidence.

Relative to trial counsel's representation on direct appeal, although counsel failed to raise the issue of the trial court's ex parte jury communication, we have concluded above that no prejudice resulted, and no other deficiency has been alleged regarding the manner in which counsel raised issues on appeal. Because only one error occurred, cumulative error analysis does not apply. The Petitioner is not entitled to relief on this basis.

CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE